Good morning. May it please the court. My name is Caitlin Rose Fisher, and I represent Tashena Crump. Defendants in federal criminal cases can't count on outcomes, but they should be able to count on basic procedural requirements. Requirements that are found in Rule 16 of the Federal Rules of Criminal Procedure, basic components of due process that are in the Constitution. And there's no doubt that in this case, some of those processes did not come to fruition for Ms. Crump. The district court itself recognized that there was a Rule 16 violation, even before the full scope of it was known, and also recognized that favorable evidence was suppressed. And the question is whether this is still a verdict that is fair and worthy of confidence. We respectfully suggest that the answer is no. There are a lot of issues in the briefing, and today we won't be able to cover all of them, so I'm planning on focusing on the discovery issues, and we'll address the other topics if there's time, although I, of course, welcome the court's questions on any topic. Before I get to discovery, though, I think that there are three factual points that are very important, and that actually underlie all of the different issues that are on appeal. The discovery issues, jury instructions, and sufficiency of the evidence. Now, the first is that there is no doubt that there was a lot of an air of legitimacy to these businesses, to this business operation. We're not talking about a case where these are large amounts of drugs that are being smuggled. This is a case about magazines. Magazines that were being sold in normal office buildings around the Twin Cities. Well, some people think massive consumer fraud is also pretty bad stuff. And I'm not saying that something bad didn't happen here. We've never disputed that. You're saying, well, this wasn't drugs or guns, and therefore don't think it's that bad. Your Honor, what I'm saying, and that's not my intent to say that. My intent is that someone walking into one of these businesses would not necessarily know that what was going on was inherently illegal. Walking in, I buy your argument. Managing and operating, I'm not so sure. Well, I think that there is record evidence that other people that were very intimately involved in these operations were unaware of the fraud. I think that one of the most important pieces of testimony on this is one of the employees of Dave Mulder, who in the indictment, Dave Mulder is described as one of the two scheme leaders immediately after Rusty Rahm. And one of his employees was a man by the name of Christian Sappington. His trial testimony is in Volume 12, and his cross-examination started at 2540. And how does this relate to the discovery issues? So, Your Honor, this is... I mean, you're starting out for a 45 or 65-minute argument, and you've got 10 or 15. Thank you, Your Honor. My point is that I think that there is not the same evidence of obviousness that there would be in other cases. And so that is relevant to how some of this additional evidence could be viewed. It's relevant to whether a materiality instruction was necessary. Again, Mr. Sappington worked closely with Dave Mulder. He was a government witness, not Ms. Crump's. He testified... I mean, he worked in an office building with Mr. Mulder, and he was completely unaware that the companies he was working for were engaging in fraud. That's because, again, in the instance of Mr. Mulder and his companies with whom Ms. Crump and her business was working, Mr. Mulder had 200 employees. These were businesses, big buildings in Minnesota. He had a licensed general counsel, and some of the uncovered evidence post-trial shows Ms. Crump communicating with that general counsel, emailing that general counsel, trying to understand how that general counsel, a lawyer licensed in the state of Minnesota, thought different issues should be addressed. The second overarching factual point is that I think there is strong evidence that Reader's Club was different. It operated differently from other companies. That's inherent in the nature of its scripts, which differed. It's also evidenced by the fact that Reader's Club is the only company in the entire scheme that engaged a compliance firm for which there is record evidence, and that was Ms. Crump who drove that. And finally, the evidence... I don't see how that gets at whether the jury focusing on the script plus the testimony that lots of callers went beyond the script permitted the conviction. There's no evidence that the callers went beyond the script at Reader's Club specifically, because no single witness testified from Reader's Club. And that's another thing, and that's the third factual point I was going to turn to. Wait, wait, no... No witness who worked at Reader's Club testified. Not a single one. And that makes Ms. Crump differently situated from both of the other co-defendants at trial, both of whom had co-workers come and testify. And again, Ms. Crump, unlike others, was not on the telemarketing phones. She was in a managerial position. Now, there were emails that she was on, right? And I'm going to not describe these the way properly, but these lists that were handed around or sold between the various co-conspirators, there was evidence that she was actively involved in that, is there not? Absolutely, there was. We don't dispute that. Now, there were also emails where she was celebrating the good lists, the fresh ones, these are hot, these are good. Why couldn't the jury infer knowledge or intent from those sort of interactions, which I think look like the people that are conspirators, they look the same, don't they? I mean, she was reacting to the conspiracy in the same way that the other people were, let's put it that way. So, I don't think the evidence is that she was reacting the same as others, and primarily it is her corresponding about PDS lead lists. PDS stands for paid during service. These were the prime targets of the conspiracy, and she knew it. So she knew that PDS lead lists were being served, but all that is, or were being exchanged between at least some of the companies, but all that is, is a customer list. I mean, there's also record evidence that in order to be a telemarketer, you need to know who to call. But she was celebrating the ones that were the current subscribers, right? That she was, so why can't the jury infer that, look, that was the heart of the conspiracy, right? Getting these people who have current subscriptions, there's value in those lists, more value in those lists, because they're easier targets of the conspiracy. So I think that for our conspiracy argument specifically, because Your Honor's questions go to sufficiency for conspiracy, our argument is not that there isn't sufficient evidence that Ms. Crump may have conspired with a smaller group of individuals, but it is that there isn't sufficient evidence that she was aware of the conspiracy as a whole, and that's because other co-conspirators were actively taking steps to make sure that she did not know that her customers were being called by someone else. And so, on conspiracy... So what conspiracy is the evidence sufficient? You said that she was involved in a conspiracy. What was the scope of the conspiracy that the evidence supports? So I'm not saying that she was involved in conspiracy. What I am saying is that our sufficiency argument is limited to scope. We are arguing that there is insufficient evidence that she was aware of the scope of the conspiracy, the nationwide scope in the indictment. And I think that matters because scope, knowledge and agreement as to scope, comes right from Pinkerton. It's a required element discussed in these, in this Court's cases, including United States v. Adejumo. But even if the Court disagrees, everything you're saying, all the questions you're asking, show why she was so profoundly prejudiced by the evidence that was not disclosed. So the Court is asking about PDS lead lists, for example. The government wrote on its brief or wrote in its brief, page 9, that the PDS lead lists were inherently fraudulent, that sometimes two-thirds of individuals on a PDS lead list would be sold magazines. Compare that, Your Honor, to record document 2352, Exhibit C, which is Exhibit C to the declaration in support of one of the new trial briefs. That's a list that was found only after trial, with the assistance of expert analysis, that shows all of the PDS lead lists over years. And what it shows is a number... You're just re-arguing to the circuit court what you didn't argue successfully to the jury or the district court. But, Your Honor, again, I'm not talking sufficiency. I'm just wondering, how many times in the last 75 years have appellate judges heard a lawyer say, this comes right from Pinkerton? People have been arguing about what Pinkerton said and what it meant and what it should mean and how it should be interpreted. Well, until the cows come home. And, you know, how far it gets with appellate courts? Maybe one time in 55. But, Your Honor, I'm not talking sufficiency right now. I'm talking about the discovery issues. And she couldn't argue this to the jury because she didn't have the evidence. She didn't have the paper that she could put before a jury to say, hey, the government's saying PDS lead lists are inherently fraudulent. Look at Exhibit C, Docket 2352. I'm just looking at the very first line, Your Honor. It says that one of these PDS lead lists started with 3,314 names. You continue along. There's evidence of Ms. Crump de-duplicating. And otherwise doing things to pare down the list. Finish number, 1,826. How many sales? There's a dollar sign. Nine. Nine out of 3,314 names on a PDS lead list. And you compare that to the government's statement in its briefing to this Court and its argument at trial that these leads were so inherently fraudulent, everyone had to know about the fraud, that two-thirds of these lead lists are being sold. That's contradicted by the evidence that was uncovered post-trial, along with a whole lot of other things that show that... Comments like, these leads are really good, so your crew should do well on them. That's pretty damning. But, Your Honor, I don't think that that shows... The crew's being telemarketers, right? Correct. And every telemarketer in every company, legitimate or not, has to use lead lists to make telephone calls. I understand that I'm into my... These lists are good suckers for what we're doing. Your Honor, you're presuming knowledge that the evidence that was disclosed post-trial would show Ms. Crump was unaware of. With the Court's permission, I respectfully request to reserve the remainder of my time. Thank you. Mr. Nelson? Good morning, Your Honor. May it please the Court? My name's Nathan Nelson, appearing on behalf of the United States. I'd like to jump right in and talk about the discovery issue to begin with. And there's really two discovery issues. There was a claim that the government violated Brady by failing to search the defendant's or get a warrant to search the defendant's work emails. And there was a second discovery claim that related to some devices, electronic devices that were seized from the Reader's Club office. And it's those devices that I'd like to focus my time on here. And in this respect, I think some background context is important. So the government agrees, everyone agrees, the government provided the defendant with incomplete copies of these devices a couple weeks before trial. But what the district court found was that this was a good-faith mistake in a trial that produced a truly extraordinary amount of discovery. The government had for well over a year made all the devices seized from Reader's Club available to the defendant for inspection and for copying. And the government did, as I've said, inadvertently provide incomplete copies when the defendant asked for them as trial approached. The government discovered its own mistake. It immediately notified the defendant of its mistake during trial, and it made efforts to quickly mitigate that mistake. It provided the defendant with full copies of what it thought were the four devices that were going to be the most important for trial, the defendant's computer, her assistant's computer, one of Mr. Williams' computers, and a USB drive that was in her office. And the government itself undertook a quick review of those devices. It gave the defendant an index summarizing their contents based on its own review to assist her. And the district court imposed a sanction on the government. The district court not only prohibited the government from using the contents of those devices at trial, in its case in chief, but went beyond that and said, not only that, you can't use them for impeachment, you can't use them for rebuttal. So the district court imposed a sanction. So the only question here is, did the district court abuse its discretion in not going even further and ordering a new trial? And the district court did not abuse its discretion for really two main reasons. The first is that evidence was not suppressed within the meaning of this court's Brady precedents. This court has made clear that a mid-trial disclosure can violate Brady, but only if it comes too late for the defendant to use – make use of the evidence at trial. And here, what the district court did when this problem was uncovered was it offered the defendant time, time to review the files before presenting her defense if she chooses to do so. And that offer of time to review the files ensured that the mid-trial disclosures would not be too late for the defendant to make use of the files. The defendant, however, declined the district court's offer of time to review the files. And as I noted in our brief, this Court has held that a defendant's failure even to request a continuance in response to a mid-trial disclosure is enough to defeat a Brady claim. So a fortiori, the defendant's failure to accept a continuance that the district court offers is – should also defeat that same claim. And I will admit there was a lot of content on these devices. Certainly, it would have taken time to review. I don't know how long of a continuance would have been necessary. But that was a judgment that the district court was leaving the door open. And the district court should have been allowed to make. And the defendant, by not taking the district court up on its offer of more time, essentially didn't – you know, didn't explore an avenue that was offered to her. More to the point, though, I think the real reason this fails is because the defendant has failed to meet her burden – and it is her burden – to show that the contents of these devices were in any way materially exculpatory. And here's where the district court's findings, I think, are going to be really helpful to the court. Because the district court did find that some of the evidence was marginally favorable. But what the district court, who sat through a months-long trial, who heard all the testimony, who watched the jurors, what the district court's conclusion was that while it was favorable, it was, quote, narrow and rebuttable. And in the district court's words, it paled in comparison to the evidence of guilt. And the district court, having sat through that months-long trial, was really in the best position to make that judgment. And I think if the court looks at the record, as I know it will, the court will see that that conclusion is really well supported. Even after trial, when the defendant had months to go through these devices, and she came forward with evidence, but really a lot of it is very narrow in scope, and it's only a handful of documents. There's reference – the one counsel mentioned most specifically was a spreadsheet. A spreadsheet that showed lead lists. It showed the start number, the number of names that were on the lead list to begin, and the number of names that were on the lead list after the defendant had called through the list. And she claims this shows her scrubbing leads, trying to get rid of people who were too old to sell to or didn't meet qualifications. But the trial record already had documentary evidence of the defendant engaging in this kind of scrubbing. Some of these e-mails about lead lists that Your Honor referenced, the e-mails back and forth, the defendant would say things like, you sent me leads, I went through them, I had to remove this many because they were already people we've called. And those e-mails, were those disclosed late? No. Those e-mails were part of the discovery since the beginning. They were exhibits at trial, and they were discussed extensively at trial. So the point, though, is that this spreadsheet was already duplicative of the kind of evidence that was already in at trial. So, the other evidence that was from these devices really doesn't fare any better. There's a one-page, there's a couple one or two-page documents that the defendant says shows her meticulous record keeping or policies about treating customers fairly. All of these were from the defendant's computer, which she received a copy of mid-trial, of these specific items. But, they really fall short of showing meticulous record keeping. So, for example, there's a one-page document showing six customer complaints from 2014. But at trial, there was evidence of hundreds of complaints across a number of years in the defendant's office. And the defendant admitted she was the person responsible during part of her employment there for handling those complaints. So, and the defendant also had other exhibits that she provided the jury arguing that I raised issues with our software, our PS Online software. I raised issues about duplicate billing. The jury heard those arguments, and the jury rejected it. What is the evidence of what I take to be the intent component here? Because it does not distinguish as much between this company, RCHO, and other companies about these scripts and other scripts. I mean, what is the evidence, as specific as you can be, that justifies the jury's verdict? Sure, Your Honor. I'm glad Your Honor asked the question. So, defense counsel said there's strong evidence that Reader's Club was different. I disagree. Here's why. There were no recorded telemarketing calls from Reader's Club. There was no evidence of recorded calls. So what the jury had was two different, a couple different categories of evidence to understand the scheme. One, they had cooperator testimony. And the cooperators testified specifically that Reader's Club was engaged in the same kind of what they called this fraudulent renewal pitch as their company. Well, were they, they weren't employees of RCHO, were they? One of them, Wayne Dahl, had been an employee of Reader's Club. At the same time as the appellant? Not as the same, not a time before. He had left by the time the defendant had started. But this is someone from the outside saying they must have been doing the same thing we were doing. I disagree, Your Honor, because what that witness did, what Mr. Dahl and another cooperator, Mr. McAletsy, there was testimony that showed their firsthand knowledge. So, for example, with respect to Mr. Dahl, he had previously worked at the company, as I said, but he also testified, I visited the company to exchange lead lists with the defendant and with Mr. Williams. I had a son who worked there. He was making fraudulent calls. In fact, another thing he did was he would hide his own number. He would edit the lead lists and put his own number into them so that people would call him and he could hear how other companies were pitching. Mr. McAletsy, who was it who was doing that? That was Mr. Wayne Dahl. Wayne Dahl. Mr. McAletsy was another cooperator. He testified that he spoke with Mr. Williams, the company owner, Reader's Club owner, extensively about Reader's Club's pitch. Mr. Williams didn't testify. Mr. Williams did not testify, Your Honor. You're correct. So, I mean, I take it there's testimony from your position that the company was engaged in this. Was there any direct testimony that the appellant was aware of this, or was there any direct testimony that she was doing those things? Well, I think Your Honor is asking about the knowledge and intent component. And the government will be the first to admit knowledge and intent in this case, as in many other cases, is seldom subject to direct evidence. Well, often it sounds like it was subject to direct evidence, just for different people. Well, none of those people could directly testify to Ms. Crump's state of mind. But, I mean, your evidence of her intent is weaker than what I'm telling, what I'm sensing with the other companies. Because you didn't have those insiders who were working next to her who were saying, yes, she was doing this, I saw her do it. Whether it was weaker or not, Your Honor, would I, the government's position is Strong enough, I take it. That a jury could reasonably infer her intent from the evidence that was presented. And I think there's a couple of categories. And does it – okay, I'll let you go with that. Sure. So I think that the most direct evidence we have, since Your Honor asked about direct evidence, is that the defendant conspired to conceal the fraud. So, for example, when she learned that the Minnesota Attorney General was investigating, she had a meeting with Mr. Williams and Mr. Michelezzi, and they talked about what they're going to do. And the testimony was she was scared and that they decided they needed to concoct a clean version of their script to send to the Attorney General. And they needed to get rid of the bad scripts. And, in fact, then there was evidence Mr. Williams did not testify, did he? Mr. Williams did not testify, but Mr. Michelezzi was a party to this conversation and he testified to this conversation. And then there was corroborating evidence that the scripts that Reader's Club later sent to the Attorney General included bogus disclaimer language that the company didn't use. For example, I'm required by law to tell you that this is a sales call. That will – So that is evidence of what? The appellant's consciousness of guilt? Consciousness of guilt, Your Honor. That's exactly right. And consciousness of guilt is something that – from which the jury can infer her knowledge and intent. The second bucket of evidence or category of evidence is these consumer complaints. There was extensive complaint – evidence of consumer complaints, credit card chargebacks, and state investigations, all of which allege the same type of fraud that the government was alleging in this case. That Reader's Club called people, it tricked them into subscribing to their service by pretending to be their existing company, and that these – the defendant was on notice of these complaints. And there certainly was a period of time when these complaints were being outsourced to a third company, but the defendant herself testified that was – for a couple of years, she did take over review of these complaints, and most of them were found within her office at Reader's Club. So the jury could infer she was on notice of the fraud by virtue of these complaints. The other way to infer knowledge and intent, I think, is just by virtue of the fact she's at Reader's Club for 10 years. She does make sales calls during a period of that time. The government had documentary evidence that she served as a telemarketer. And there was testimony that – from other telemarketers or other people that the fraudulent nature of the calls was obvious. Even sometimes new people would walk off the job within a matter of a couple of hours or a couple of days because the fraudulent calls. I guess what pauses is of the calls. I mean, you're saying basically that fraud was rampant in this company, and someone who was part of it for 10 years in a supervisory position must have known. Is that what it comes down to? And that may – I mean, that may be sufficient, because, I mean, I use direct, but there is no distinction, I don't believe, between direct and indirect evidence. I think that is what it comes down to, that from her conspiracy to conceal the fraud from these complaints, from her running the company for 10 years based on – with calls that are – that other people testified are obviously fraudulent, the jury could infer. Based on that, it's sufficient for a reasonable jury to infer she must have known about the fraudulent calls. And then there is the last category of evidence or one that I mentioned is these buying, selling, trading of lead lists with statements in there that suggest knowledge of fraud. You know, these are – these are hot, hot, hot, you know, the – this fire slang for good material for fraud, and there is language in the emails themselves that suggest knowledge of the fraud. I see my time is up. So for all these reasons, the government asks that this Court affirm the judgment of the district court in all respects. Thank you. Thank you. Ms. Obama. Thank you. The government just repeated an error that it made in its briefing and below, and that is that it did not separately address the failure to disclose the devices specifically related to Brian Williams, which are discussed at length in both Docket 2411 and 2352. The government, in addition of Mr. Williams' computer's mid-trial, what it omitted is that it did not tell the Court or Ms. Crump that there was a second computer found in Mr. Williams' office. That computer has evidence that features prominently in Ms. Crump's post-trial motions. Relatedly, I want to – I don't have time to address all of the categories of evidence that the government just walked through, so let me start with the first. As for evidence of consciousness of guilt, this cover-up, alleged cover-up of the AG, there were allegedly four people there, Mr. Williams, Ms. Crump, Mr. Dahl, Mr. Michelizzi. Mr. Dahl did not testify to that. I believe that there is actually testimony that he and Mr. Williams and Mr. Michelizzi had a separate meeting at a Perkins that Ms. Crump was not a part of. In any event, however, the nondisclosed evidence goes directly to that issue and would have provided a basis for either calling Mr. Williams, which I think is relevant to at least Rule 16, or impeaching Mr. Dahl about Mr. Williams and Mr. Dahl's communications regarding the Attorney General's office. Specifically, at Docket 2352, this is Exhibit K, Dahl and Williams are emailing about the AG communications. Ms. Crump isn't copied. It's an email that Mr. Dahl sends to Mr. Williams' kind of clandestine email address, warcrack.com. I mean, I think also notably, when Mr. Williams turned on his burner phone in June of 2020, the very first call he made was to Mr. Michelizzi. Never once in the months that he had that phone did he call or communicate with Ms. Crump. This, again, is all relevant to whether Ms. Crump was a part of that Attorney General's meeting, whether she was a part of any conspiracy that Mr. Williams, Mr. Dahl, and Mr. Michelizzi were a part of. And finally, as far as the reference to the dirty scripts, again, we're just talking about the FTC sales disclaimer language. Those so-called dirty scripts that Ms. Crump knew was dirty, she sent to Compliance Point for sending to the Attorney General of Indiana. Those are the scripts that are included in our addendum. I think also just taking a step back, it's true, we don't have a lot that we included in our post-trial motions other than what relates to Mr. Williams, but that's because one of the most telling things about what we looked through was the absence of evidence. The absence of evidence that Ms. Crump was intricately involved in this conspiracy. Instead, what we saw was evidence of someone who, consistent with her testimony, was primarily focused on human resources, was primarily focused on the day-to-day business operations. Brady turns not on the character of the prosecutor, but the character of the evidence. The trial here is not fair, and it is not worthy of confidence, and we respectfully request that Ms. Crump's conviction be vacated.